Please call the next case. 113-766, Amron Electronics v. Crenbaugh Good morning, Justices, Counsel, and may it please the Court, my name is Jigar Desai and I represent the respond- er, excuse me, the appellant, Amron Electronics. Briefly, this case involves a widow, Ms. Bauer, who has petitioned for benefits under the Occupational Diseases Act due to the tragic and untimely death of her husband, Craig Bauer. Mr. Bauer worked as the COO of Amron Electronics and he frequently traveled to Asia and South America in the course of his work duties. This comes back from Sao Paulo, Brazil? Correct. Falls ill, dies, cause of death listed to be a form of meningitis, correct? I mean, there's technical words, but it's a form of meningitis, right? Bacterial meningitis. He's in the United States, he's in a business trip in Asia. There's no contention that he acquired bacterial meningitis while in Asia. He's in the United States from June 14 to June 20, 2006. On June 20, he leaves the U.S. for a business trip to Brazil, arrives on June 21, he's in Brazil for a period of approximately 36 hours, he returns back to the United States. On June 23, him and his wife go to their lake house on June 23, and on June 24, Mr. Bauer starts to experience flu-like symptoms and he passed away on the evening of June 24 as a result of bacterial meningitis. The arbitrator denied compensation, finding that the evidence was insufficient to establish proof of exposure. The commission reversed, finding there was an occupational exposure. The circuit court affirmed the commission's decision is not against a manifest way to the evidence. So all the doctors agree, am I correct, that the incubation period for this form of meningitis is between 2 to 10 days, correct? That's correct. Why isn't this just simply a battle of the experts and the other side won the battle? Well, the commission's decision was against a manifest way because of the reliance on Drs. Drew and Stratton. And those doctors have impeccable credentials in infectious disease, right? They do have impeccable credentials. We're not questioning their credentials, but we are questioning the evidence upon which the experts base their opinions. The experts attached a number of studies to the deposition transcripts as well as provided evidence. So we're supposed to go behind their opinions and read these studies and basically say the experts were wrong in how they interpreted those studies? That's correct. If that forms the basis of their opinion, then it is important that this Court look to what forms the basis of their opinion. Well, what evidence was presented to say that their methodology, their conclusions were based on wrong methodology? The studies attached to their deposition transcripts do not support the experts' conclusions that it was more likely than not or that there was a reasonable medical certainty for opining that he contracted meningitis while in Brazil. How do we know that? Because if we look at those studies that are attached to the deposition transcripts. That would only go to the weight of their testimony. It wouldn't go to dismissibility, would it? Excuse me? The study that you allege contradicts their testimony doesn't go to the admissibility of their testimony. It only goes to the weight to be given to it, doesn't it? That's correct. And weight is determined by the commission. Well, if the commission doesn't fully consider what the experts are basing their opinions on. How do we know that they didn't fully consider it? Because the commission simply accepted the experts' opinions. Well, they accepted it, but that doesn't mean they didn't consider what was behind it. Well, it doesn't appear based on a review of the decision that they considered what they were basing their opinions on. For example. Does it have to? Does the decision have to reflect what they considered? Well, we think we would argue that it does. I mean, if the experts are not basing their opinions based on actual. . . That's weight. That's weight. That goes to the argument you shouldn't believe this expert because. . . And somebody has got to make a determination whether they are going to believe the expert or they are not going to believe the expert. Kennedy, do you want to give your example about the chicken entrails? This is a good time for your example. Well, I do use that example frequently, but I'll use it for you. Should an expert testify to A, it's his opinion, and when asked how did you arrive at that opinion, he said because I consulted the entrails of chickens, what you would do is strike his testimony as incompetent and remove it from the record. If he turns around and said, I based my testimony based on what is suggested in so-and-so on anatomy, and if you read so-and-so on anatomy, it doesn't support his opinion, that only goes to weight. He hasn't made something so ridiculous that even a non-expert would understand this is silly. And in this particular case, Drew was pretty emphatic. He turns around and testified that the last day that this man could have contracted this meningitis was on June 22nd or early on June 23rd. And the earliest he could have contracted it was on June 14th. He testified, I can say that this man would not have died at this time from this  He testified that he would not have died from meningitis while in Brazil. That was his testimony. This guy is a doctor. Right. But that testimony is purely speculative. Why? There is no evidence that Mr. Bauer came into contact with a carrier of meningitis. Well, how would you understand that? How could you possibly know that? We do. Well, certainly he did. He died from meningitis. He died. He did not come into contact with a carrier of meningitis while in Brazil. He could have, based on the incubation period, come into contact with a carrier while in the United States. However, his experts testified that it was more likely true than not true that he came into contact with someone in Brazil. Why can't the commission credit that testimony? What those experts base their opinion on is the infection rate. We have an infection rate in the United States of 1 out of 100,000. That's 1 ten-thousandth of a percent. We have an infection rate in Brazil of 2 to 5 out of 100,000. And these infectious disease specialists with impeccable credentials thought that was significant. You can argue the numbers if you want, but these infectious disease specialists say that's a significant issue. If the numbers alone, which is what the experts base their opinions on, if that number alone, that difference in the infection rate, is sufficient to establish proof of occupational exposure, then the commission's decision is not against manifest way to the evidence. However, we would argue that it still doesn't take it out of the realm of pure speculation and conjecture without evidence of more. We have a bigger problem that's being ignored here. And I know you're going to argue at some point probably Cohen-Tsar having an opposite opinion, but that's not really the case. Drew and Stratton were emphatic on a causal opinion, causal connection opinion, that he contracted it during the trip to Brazil. When you look at what Cohen-Tsar testified to, tell me if this is wrong, that based on an incubation period of 2 to 10 days, they could not determine whether the employee was exposed to that meningitis before or during the trip to Brazil. They never testified, did they, that in their opinion he was not exposed to it when he was in Brazil? Did they? No. Okay. So you're contesting the validity of the claimant's experts. Nevertheless, their causal connection opinion is in the record, claiming it's based on flawed data. On the other side, you have nothing to contradict that, really. You have two doctors that really don't say anything. They say, we can't tell if he got it. Against the two experts that say he did, you've got nothing on the other side. So how is an opposite conclusion clearly apparent, even with the argument of a flawed foundation? Sure. With respect to the manifest way to the evidence. And that's what it comes down to. Two things are well established. One, it's the claimant's burden approving their case based on a preponderance of the evidence, not our job to refute every other possible avenue where he. And they point to Stratton and Drew and they say, this is our evidence in support of the record. The second thing that's true is that findings of exposure can't be based on pure speculation and conjecture. And that's what the experts did here. What does the Occupational Disease Act say about what you have to prove? Proof of exposure is, the evidence required is that it's more likely than not. Indirect evidence is sufficient. Let me read you a quote. It says, quote, a disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. Isn't that what the commission did here? They considered all the evidence, the experts' opinions, knew he'd been to Brazil, and it appeared to the rational mind that it arose out of his employment and they awarded compensation. I mean, I go back to Justice Harris. I think it was a reasonable question. Isn't this just a battle of the experts like we have in a lot of cases? Well, we come back to our argument that it's still, the decision still can't rest on pure speculation and conjecture. Okay. We don't disagree with that. When we look at the prior decisions where occupational exposure is found or where compensation is denied, and when we review Apelli's brief, there's, or the commission's decision, there has not been a case cited that's been decided by this Court or the Supreme Court where occupational exposure has been found based on the numbers alone, which is what forms the basis of the decision here. Okay. So we're dealing with, as Justice Stewart has written, what a rational mind would conclude. But is there not evidence that the rate of exposure in the United States is less than the rate of exposure in Brazil? Is that, that's just, there are experts that these are the two rates of exposure. Is that true or not? It is. We don't dispute that. Okay. So can a rational mind conclude that if you come down with a condition which you don't refute, you had that condition, it was placed in Brazil where a higher rate of exposure has been established by an infectious disease specialist, can a rational mind conclude that the exposure occurred in Brazil? If this Court concludes that, that is alone enough for a rational mind to conclude that the exposure occurred in Brazil, then this Court would affirm. May you finish? I'll let you finish. Then this Court should affirm the Commission's decision. Our argument is that that evidence alone is not sufficient to take this case out of the realm of pure speculation and conjecture without something more to show that he was perhaps in those kinds of settings that the articles that are attached to the deposition, transcripts describe as creating an increased risk of exposure of infection, such as COVID. I think you're setting a standard that you could never recover an infectious disease under your standard, because you basically, without admitting it, are saying he can't establish when and where he contracted this disease. Nobody would ever be able to do that specifically. No, that's not our argument, Your Honor. This isn't a case where an individual was in a known outbreak location, such as in West Africa on a business trip, and then they come back. He was in Brazil where the rate is higher. You conceded that. And it's not just higher. Dr. Stratton said two to five times higher. Dr. Drew said three to six times higher. So, I mean, this is kind of ‑‑ I think Dr. Drew used the words very major red alert. So it sounds like maybe a hot zone for this meningitis bug. Well, and that's what's wrong with his opinions, is that when you actually review the studies, there's no evidence of a current outbreak in Sao Paulo, the city, which is where Mr. Bauer was. Okay? And the studies and the articles attached to the deposition transcripts talk about how the risk to travelers is especially low, and risk of contraction is rare. They talk about how you would ‑‑ the risk of infection increases in exposure to crowded settings, such as the Hajj pilgrimage to Mecca, or in college dormitory settings. Well, they talk about those things, but it only takes one person, right? I mean, he could walk in a bathroom and one person in that bathroom be a carrier and get the meningitis. Exactly. And when we talk about the infection rate in the United States and compare it to Brazil, saying it's two to five times greater, you can say it that way. But it wasn't ‑‑ But we're one out of 100,000 compared to two to five out of 100,000. He could have just as easily come into contact with somebody here in the United States during the period of time he was here. Based on the short duration of time he was there and the limited context he had while he was in Brazil. And again, I ask you, how could a person ever prove it under your standard? Well, we can prove ‑‑ you can prove it by showing, for example, if a hospital worker is in West Africa and they work with a patient. But he's not a hospital worker. He's a traveling businessman. So how did a traveling businessman ever prove exactly when and where he got it? It's not about proving when and where. It's about proving a higher risk of infection than simply citing infection rates. So, for example ‑‑ How do you determine the higher infection rates are based upon having the condition, right? Correct. So you have to be exposed to have that condition, right? Well, in the case of meningitis, as one of the experts acknowledged, Mr. Bauer could have even been a carrier of meningitis for a period of time because many carriers are asymptomatic. I mean, all four experts acknowledge that it's not possible to know when and how he contracted it. Even appellees' experts acknowledge that it's possible he had meningitis before he left, although they think it's unlikely, right? And what they base their opinions on is why it's unlikely is the incidence of infection. That's what Dr. Drew said. Dr. Drew said that he offered his opinion that it is more probable than not that he contracted it in Brazil. He didn't testify that it was possible. He said it was more probable than not. He testified in the realm of probability, not in the realm of possibility. So now the question becomes why couldn't the industrial commission accept that? Well, because we think the basis of his opinion is infection. We understand that. You base it based on the opinions of your doctors, and you attack the weight to be given to his. They make the determination of weight. If there's any evidence in the record to support their conclusion, we have to affirm it. Now, regardless of what we do with it, if the evidence in the record is Dr. Drew's testimonial home. But we have to evaluate the basis of his opinion. No, no, no, no. We don't re-weigh his basis. That's weight. Unless you could establish that he was absolutely incompetent to give a medical opinion, you're stuck with it. And then to determine that the weight to be given to it is that of the industrial commission, it is not that of this Court. Right. So the commission accepts an opinion of a doctor who is basing his opinion on a higher risk of infection. Yes. Just by virtue of the numbers. Right? Well, the argument is still that that's insufficient. Says who? Says who? It still rises to levels. Excuse me. Says who? Says you or another expert? This, well, says Dr. Cohen's czar that it's still impossible to know whether or not he got it in Brazil. But Drew says it is probable, it exists within the realm of probability, that he did. Right. He thinks it's more probable that he got it in the United States. Yes. More probable than not. All four experts acknowledge it's hard to know where exactly he got it. But that's not the question. If he has given an opinion saying in his opinion I can say he would not have died at this time in his life from this infection had he not made the trip to Brazil. And that he indicates that his opinions are being given within the realm of probability, not the realm of possibility. So that takes it out of speculation or conjecture. Now, you say that's wrong. That's wrong because you have a doctor that says that's not the case. Who gets to decide which of these two medical opinions they're going to believe? Our argument is that the Commission's reliance on Dr. Stratton and Drew in accepting their opinions was against the manifest way of the evidence. Why? Because the opinions of Dr. Stratton and Drew rely solely on the rate of infection. So that's incompetence. Says who? On reply, you can answer that. Okay. You'll have time. Thank you. Thank you. Counsel, you may respond. Justice, and may it please the Court, Counsel, good morning. My name is Anthony Acuda. It's my honor and privilege to represent the widow of Mr. Craig Bauer. I think the facts are pretty clear. The man went to Brazil on a business trip, comes back, and he dies. The condition that he died from was this Neisseria meningitis, which is really prevalent in Brazil. When I took upon this case, I knew that I would someday face this honorable court, and I wanted to be as prepared as I could possibly be prepared. I didn't just get one expert. I searched and I searched until I found even a better expert, and when I found both of the experts, they agreed, which is sometimes rare when you hire experts that the two of them would agree. And I did my own kind of independent blind study. It doesn't show that in the record, but I gave both of the experts the records. Well, you better be careful about doing that. Okay. All right. I'll move on. Well, the bottom line is they found some experts too. That's correct. They found some experts. However, the experts, Drew and Shred, are infectious disease specialists. Cole is an occupational doctor, has no experience that he's elaborated on or testified in. Besides that, as you talked about earlier, they never specifically, Cole and the other doctor, challenged the findings of your experts. I mean, they basically said they couldn't tell if he got it in Brazil, but they didn't undermine the opinion. Did they specifically? No, not at all. No, never once did they challenge the doctor's opinions, nor did they challenge the doctor's credentials. Let's get to the chase. I think it's fair to say, as we started out 25 minutes ago, this was a battle of the experts. I agree. Your opponent conceded that when he got up, but he says, uh-huh, yes, their conclusions were flawed on flawed methodology. That's the only thing he can hang his hat on. So how do you respond to that argument? He has no proof. He has no documentation that the methodology is false. His doctors never said that the methodology that was used by Dr. Strand or by Dr. Drew was false. He never raised any kind of a motion to exclude or any kind of motion. There's nothing in the record to suggest that, is there? No, not at all. Not once did anybody challenge the opinions of Dr. Drew or Dr. Strand. What's the methodology here? Let's kind of shorten it up here. Methodology was what for your two doctors? The methodology is they looked at the facts. They looked at the prevalence of disease in Brazil at six times higher than it is in the United States. They looked at the cost connections, the nexus between the time of travel and the date of death. When you look at all those factors, everything matched up. The commission looked at everything, and they came up with the same conclusion. Everything matched up. When you look at the spoiling decision that we cited, that the commission cited, everything matched up. A rational person came to the conclusion that Craig Bauer died as a result of his travels in Brazil. And the incubation period lined up even within Cohen's Art, did it not? Yes, it did. Well, the incubation period was, I think Drew testified, the earliest he could have contracted would have been June the 14th. He left Chicago on June the 20th, and the latest he could have contracted, it was June the 23rd. And he spent June the 20th to the 23rd in Brazil. Correct. A correct statement of the facts? Correct. And Drew draws the conclusion that because the incidence of this particular infection is so much higher in Brazil, that it's more likely, it is probable, that means that it's something more than mere possibility according to him, that he contracted this in Brazil, and that makes the case. And that's Drew's evidence. That's absolutely true. And the other thing I would just point out to you is the way this disease manifested itself, the way this disease spread, and the way it killed Mr. Bauer was such a rapid pace. If he would have caught the disease on June the 14th, he would have been dead by June the 16th or June the 17th. He would have never made that trip to Brazil. He would have died in the Chicagoland area. He made the trip. The only thing that was in the record was he had some kind of a, maybe a respiratory infection, could have had a cold. And Dr. Drew and Dr. Stratton both say that that could have accelerated it. It could have compromised his immune system. But, again, the source, the cause, all point to Brazil. But, you see, I'm only concerned with the question of manifest ways. If Drew's opinion is not incompetent, but rather is competent, then the value of that opinion is a question of weight. That's correct. We don't re-weigh evidence here. We merely make a determination as to whether it exists. Now, if there's evidence in the record, any competent evidence in the record, to support the commission's decision, we have to affirm it. That's the manifest weight standard. So now the question becomes, is there, it boils down to the question of whether Drew's opinion is competent or not. And if it's incompetent, it should have been stricken. It wasn't. And all the other arguments that I'm hearing go nothing more than the weight to be given. I don't have an argument with that. I certainly agree with you, Justice Hoffman. And, again, you look at the decision of the commission. It's a 3-0 reversal of arbitrator Kane. So you had three collective minds that looked at the same evidence, and they all signed their name on it and said, is within a reasonable, rational standard, and they found four petitioner in this case. So when you take all the things into consideration, this case, the decision of commission, was not against the manifest weight of the evidence. The commission decision should stand. I respectfully pray that you would let it stand. Thank you. Thank you, counsel. Counsel, you may reply. The argument that we're making remains that the commission relies on two experts. And if we're talking about weight, then we can talk about the weight that the commission gives to these experts' opinions and accepting them. But what the commission has done, essentially, is say that all that's required to prove occupational exposure is showing a higher rate of infection in a place where you were visiting without anything more. There was no evidence here to establish that Mr. Bauer came in contact with a carrier. There was no evidence here to establish that Mr. Bauer was in crowded settings. The commission inferred that he had significant public contacts, but all the evidence of record shows that any public contacts that he had were fairly limited. He arrives in Sao Paulo. He goes straight to the office. He performs interviews with a limited number of employees. He goes to a headhunter's office, performs a limited number of interviews there, then goes to a restaurant, which a witness for the appellant testified was fairly empty, spends the night in his hotel, goes back to the office the next day, and gets taken by an employee who does not have meningitis to the airport and leaves Sao Paulo later that day. Didn't he go to a McDonald's in there somewhere? He did. But we don't know anything more. I just wanted to add that to your... Right. And he went to McDonald's, I believe, for breakfast the morning that he left. But we don't know anything more than that. So what the commission has done here is say all that's required to prove occupational exposure, exposure to meningitis, is a higher incidence of infection. How are you exposed to meningitis? What is the mechanism of exposure? I believe all the doctors testified that it can be spread through droplets. So it can be spread through the air. Sneezing and coughing? Sneezing and coughing. I don't believe it's airborne in the sense that the flu is airborne. One area of substantial contact that you've omitted is the travel portion, traveling in an enclosed airplane cabin full of people presumably either coming from Brazil or going to Brazil that are Brazilian, but also increase the potential for that airborne contact. True? Well, respectfully, no. And I think that either Dr. Drew or Dr. Stratton testified that they don't believe he got it on the airplane because of the way the air is filtered and it would have cleared out the air. So the theory of the case is not that he contracted it on either his flight down or his flight back. In the airport, also another area where there are a lot of people. The commission inferred that the airport constituted a place where there may have been significant contacts. But, again, we don't believe that's a reasonable inference without any additional evidence in the record to support it. There's no evidence to establish that there was an outbreak of meningitis in the Sao Paulo airport. There's no evidence in the record to establish that the Sao Paulo airport was particularly crowded on that particular day or on that particular day. Excuse me. What if he got it at O'Hare when he's leaving for his trip? He's a traveling employee. Wouldn't matter, would it? No, it wouldn't, Your Honor. Have you ever been to O'Hare airport? I have been to O'Hare airport. Usually a lot of people there? There are. Just this. It's true. But, again, without anything else, we don't know what the condition of the airport was. And the theory of the case is not that, I mean, the finding of the commission is not that he got it at O'Hare airport. Just making a point. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments. I don't really believe, I think we've heard the case. Okay. Thank you. Okay. Thank you, counsel, both, for your arguments. This matter will be taken under advisement. Written disposition shall issue. The court will stand in recess until 1 p.m.